**2026 WI 16**

# Supreme Court of Wisconsin



SHEBOYGAN COUNTY,
*Petitioner-Respondent*,

*v.*

N.A.L.,
*Respondent-Appellant-Petitioner.*

No. 2024AP1195
Decided May 19, 2026

REVIEW of a decision of the Court of Appeals
Sheboygan County Circuit Court (Rebecca L. Persick, J.) No.
2023ME189

JILL J. KAROFSKY, C.J., delivered the majority opinion of the Court, in which ANNETTE KINGSLAND ZIEGLER, REBECCA FRANK DALLET, BRIAN K. HAGEDORN, JANET C. PROTASIEWICZ, and SUSAN M. CRAWFORD, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. REBECCA FRANK DALLET, J., filed a concurring opinion, in which JANET C. PROTASIEWICZ and SUSAN M. CRAWFORD, JJ., joined. JANET C. PROTASIEWICZ, J., filed a concurring opinion, in which REBECCA FRANK DALLET and SUSAN M. CRAWFORD, JJ., joined.

¶1 JILL J. KAROFSKY, C.J.   N.A.L., referred to by the pseudonym Nathan, seeks review of a court of appeals' decision affirming circuit court orders related to his involuntary commitment under WIS. STAT. ch. 51.

Nathan asserts a violation of his constitutional right to due process under the Fourteenth Amendment to the United States Constitution occurred when the circuit court failed to conduct a colloquy to ensure his stipulations to orders for commitment and involuntary medication were entered knowingly, intelligently, and voluntarily.

¶2     We hold that due process does not require a circuit court to conduct a colloquy before the court accepts a stipulation to orders for commitment and involuntary medication under WIS. STAT. ch. 51. As such, we affirm.

## I. BACKGROUND

¶3     Nathan was emergently detained under WIS. STAT. § 51.15 (2023–24)[1] in November of 2023 after reporting to hospital personnel that he was hearing voices telling him to harm himself. Sheboygan County then initiated involuntary commitment procedures under § 51.20. On November 29, 2023, the circuit court held an uncontested hearing and found probable cause for commitment under § 51.20(7). The court scheduled a final hearing for December 7, 2023. Prior to both the probable cause hearing and the final hearing, Nathan received a form explaining some of his rights.[2]

¶4     At the final hearing, all parties appeared by phone—Nathan from his treating facility and his counsel from elsewhere. The County began by indicating that Nathan was not contesting the involuntary commitment. The County then moved to admit two doctors' reports into the record "and use those as a basis for the [c]ourt's findings along with [Nathan's] stipulation." Nathan interjected, "What's a stipulation?" The circuit court then turned to Nathan's counsel, prompting the following exchange:

---

[1] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

[2] Such rights include but are not limited to the right to counsel, provided at no cost through the public defender's office (WIS. STAT. § 51.20(3), (5)(a)); the right to choose one of two court-appointed psychiatrists (§ 51.20(9)(a)); the right to a jury trial if timely requested (§ 51.20(11)); and the rights to testify or remain silent (§ 51.20(5)(a)).

**Attorney Blum:**     . . . Your Honor, having reviewed both doctors' evaluations and going through them with my client, we are not disagreeing, AKA, contesting the doctors' recommendation and therefore the County's request. So we are stipulating to the request of the County.

My client would like to be released today, but he understands based on that request that he would be released by the treating physician there at Winnebago and that it is a locked facility at this time. He is not contesting at this point. He's working with the Department. And, again, based on those doctors' evaluations, he's not contesting.

**The Court:**   Okay. So, [Nathan], stipulation just means you're agreeing that the Court, meaning me, Judge Persick, can grant a commitment in your case; is that correct?

**[Nathan]:**     I suppose.

The circuit court next received the doctors' reports and made three findings: (1) Nathan suffered from a mental illness; (2) Nathan was a danger to himself or others under the first, second, and third standard of dangerousness under § 51.20(1)(a)(2); and (3) Nathan was a proper subject for treatment.

¶5     The circuit court next addressed the County's request for an involuntary medication order. The court found that the medications would have therapeutic value, the medications would not impair Nathan's ability to participate in legal proceedings, and that because of his mental illness, Nathan was not able to apply an understanding of the advantages of the medications to his situation.

¶6     The circuit court spoke again to Nathan directly:

**The Court:**   . . . So, [Nathan], I'm asking you to take your medications voluntarily, but if you don't –

**[Nathan]:**     I am.

**The Court:**   Okay. That's great. But I'll authorize them to be administered involuntarily if you don't agree in the future. Hopefully you will continue to agree.

**[Nathan]:** I will continue to agree if I get discharged from Winnebago here.

**The Court:** Yeah. That will lead to your discharge eventually because that will help stabilize you.

**[Nathan]:** How long do I have to wait?

**The Court:** That's something you'd have to ask your doctor because that will be when your doctor thinks you're ready.

**[Nathan]:** Oh.

**The Court:** Okay?

**[Nathan]:** Well, I thought that we were evaluating that today on the court date.

**The Court:** Today was just to decide whether there should be a commitment order or not.

**[Nathan]:** I don't—

**The Court:** Well, that creates some issues, Attorney Blum. Did you want a chance to speak to your client quickly?

**Attorney Blum:** Your Honor, I don't. I mean, I can try to call the institute. I'm not sure if there's a way to – there's not really a breakout room.

When I spoke to him, it was my understanding that he – and that's why I reiterated earlier he does want to be released today. We had talked about him working with the case manager and talking to them, you know, today, I think, when they project his discharge but understanding that it would be up to that treating physician. And that's why I stated we understood it would be up to the Winnebago doctors.

**[Nathan]:** I agree to that.

**Attorney Blum:**     Right.

**The Court:**   All right. So, [Nathan], you do agree to that?

**[Nathan]:**   Yes.

**The Court:**   Okay. And are you also agreeing that there can be a commitment order?

**[Nathan]:**   Only if I'm able to be discharged in the next, you know, agreeable period of time.

**The court:**   And I don't have an answer to that how soon that will be.

Attorney Blum, have you had any discussions with his case manager? Do you know what a reasonable expectation is?

**Attorney Blum:**    I did not get that answer. I'm not sure. I don't know the specific number. I don't know.

**The Court:**   Well, it's unclear to me whether this is an actual stipulation to commitment or not.

¶7     The court explored options for Attorney Blum and Nathan to discuss matters in private, and Nathan specifically asked for an opportunity to have a video chat with his attorney. The court said there was no ability to do an immediate private video chat and asked whether the final hearing could be rescheduled to that afternoon to comply with the statutory time limit. But the court noted that the independent evaluator witnesses likely would be unavailable. Then Dr. Bales, one of the independent evaluators, spoke up and the following exchange ensued:

**Dr. Bales:**   Probably not. If I could interrupt. It's about housing support and then getting a good aftercare plan. I will estimate he will be out of there within a day or two. But I just don't want to speculate and not receive an update. But he really is not going to be in there long term based on what I had seen when I interviewed him if that helps.

**[Nathan]:**   That does help.

**The Court:** All right. So, [Nathan], with that representation by Dr. Bales, who is on the phone as well, are you willing to agree to the commitment?

**[Nathan]:** Yes. I'm willing to agree.

**The Court:** Okay. Then all the findings I made previously will remain in place, and then that is all for today. Thank you.

**[Nathan]:** So then I'm supposed to be released in a few days of my commitment, or what does this mean?

**The Court:** Attorney Blum, are you still there?

Madam Clerk, did Attorney Blum hang up?

**Court Clerk:** Yes, he did hang up.

**The Court:** [Nathan], I'm going to advise you to contact your attorney, but Dr. Bales thought it would be within a few days.

**[Nathan]:** Okay. Thank you.

**Dr. Bales:** The final word is your treating doctor, but truly we want you to have good housing and aftercare plan to make sure you don't have to come back to Winnebago. But safely. It's getting cold out, sir.

**[Nathan]:** I understand that, sir.

**Dr. Bales:** Okay.

**[Nathan]:** And I have a place to go, which would be either my brother's house or my sister's house.

**The Court:** Okay. That's all for today. We really can't continue to talk without your attorney present, so I'm going to hang up now.

¶8 The circuit court entered orders committing Nathan for six months and allowing for the administration of involuntary medication

and treatment. Five months later, Nathan filed a post-disposition motion arguing that his due process rights were violated when the circuit court failed to conduct a colloquy to ensure his stipulation was entered knowingly, intelligently, and voluntarily. The court denied the motion. Nathan then appealed the entry of the orders and denial of his post-disposition motion. The court of appeals affirmed the circuit court's orders.

## II. ANALYSIS

¶9 The sole issue before us is narrow: whether the circuit court erred in failing to conduct a colloquy before accepting Nathan's stipulation to his orders for commitment and involuntary medication. Importantly, Nathan does not argue that his stipulation was not entered into knowingly, intelligently, and voluntarily. Instead, Nathan pursues what is essentially a structural error challenge. He argues that his right to procedural due process under the Fourteenth Amendment of the United States Constitution requires the court to conduct a colloquy to ensure he is waiving his fundamental rights knowingly, intelligently, and voluntarily. Nathan argues that the absence of a sufficient colloquy is itself a due process error requiring reversal. We disagree. Because Nathan did not otherwise challenge the knowing, intelligent, and voluntary nature of his stipulation, we do not address whether the circuit court correctly accepted Nathan's stipulation in this case.

¶10 We begin by reviewing the procedural due process principles that guide this case. We then explain that there is no due process rule that a court conduct a colloquy prior to the waiver of every fundamental right. Next, we address Nathan's argument analogizing a ch. 51 stipulation to circumstances where a colloquy is required. Finally, we determine that, given the circumstances surrounding a ch. 51 commitment, due process does not otherwise require a court to conduct a colloquy prior to accepting a stipulation to an order for commitment or involuntary medication.

¶11 Due process determinations are questions of law we decide de novo. *State v. Denson*, 2011 WI 70, ¶47, 335 Wis. 2d 681, 799 N.W.2d 831; *State v. Aufderhaar*, 2005 WI 108, ¶10, 283 Wis. 2d 336, 700 N.W.2d 4. To the extent our analysis turns on the interpretation of relevant statutes, statutory interpretation is reviewed de novo, benefiting from the analysis of the circuit court and court of appeals. *Aufderhaar*, 283 Wis. 2d 336, ¶10.

¶12 There is little doubt that a ch. 51 civil commitment "constitutes a significant deprivation of liberty that requires due process protection." *Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶42, 391 Wis. 2d 231, 942 N.W.2d 277 (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)). The requirements of procedural due process depend on the nature of the rights at stake and the surrounding circumstances. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950))).

¶13 Nathan contends that when an individual is waiving fundamental rights, the court must conduct a colloquy on the record to inform the individual of the fundamental rights being waived and the potential consequences of waiving those rights. With respect to his stipulation to the commitment, Nathan's argument centers on two purported fundamental rights: (1) the right to be free from physical restraint, and (2) the right to a fair hearing in which the petitioner must prove by clear and convincing evidence that the individual is mentally ill and dangerous.

¶14 Even if we assume without deciding that these rights are fundamental, due process does not require a colloquy prior to their waiver. As a starting point, constitutional due process simply does not require a colloquy prior to the waiver of every fundamental right in every circumstance. "A waiver of a fundamental right is 'ordinarily an intentional relinquishment or abandonment of a known right or privilege.'" *Denson*, 335 Wis. 2d 681, ¶56 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). However, it does not follow that a colloquy is constitutionally required to ensure the intentional relinquishment of such a right. Indeed, this court has held that a circuit court need not conduct a colloquy prior to accepting a criminal defendant's waiver of the right not to testify, even though it is a fundamental right that can only be waived knowingly, intelligently, and voluntarily. *See Denson*, 335 Wis. 2d 681. This example alone belies Nathan's claim that a colloquy is required every time a fundamental right is waived.

¶15 Furthermore, even when we have required a court to conduct a colloquy prior to accepting the waiver of certain fundamental rights, we have not declared the absence of a colloquy to be a fatal due process violation. Rather, in the absence of a colloquy, we have assessed whether the waiver was entered knowingly, intelligently, and voluntarily,

either by remanding for an evidentiary hearing or reviewing the record as a whole. *See State v. Klessig*, 211 Wis. 2d 194, ¶¶14–15, 564 N.W.2d 716 (1997) (holding that a colloquy is necessary before a circuit court may accept a criminal defendant's waiver of his right to counsel but remanding the case for an evidentiary hearing to determine if the waiver was entered knowingly, intelligently, and voluntarily); *State v. Weed*, 2003 WI 85, ¶¶43–44, 263 Wis. 2d 434, 666 N.W.2d 485 (holding circuit courts should conduct a colloquy before accepting a criminal defendant's waiver of the right to testify, but also determining that the record supported that defendant's waiver was knowing, intelligent, and voluntary).

¶16 These cases demonstrate that the constitutional violation arises when a waiver of a fundamental right is not entered knowingly, intelligently, and voluntarily. The violation does not stem from the absence of the colloquy itself. Indeed, members of this court have referred to the colloquy requirement as a procedural "prophylactic measure," imposed to preemptively protect an individual's due process rights. *See State v. Fugere*, 2019 WI 33, ¶68, 386 Wis. 2d 76, 924 N.W.2d 469 (Ann Walsh Bradley, J., dissenting). In other words, Nathan's claim that the absence of a colloquy constituted a structural constitutional error is inconsistent with our case law and we reject it.

¶17 Nathan also maintains that § 51.20 commitment proceedings are similar to other circumstances where a colloquy is required before a waiver of rights, including a criminal plea hearing, a termination of parental rights (TPR) proceeding, and a commitment hearing when an individual subject to commitment waives the right to counsel. None of these comparisons advances Nathan's position.

¶18 Most importantly, constitutional due process does not compel a colloquy in the criminal plea or TPR context. Instead, a colloquy is required in those contexts by statute. *See* WIS. STAT. §§ 971.08, 48.422(7); *see also State v. Bangert*, 131 Wis. 2d 246, 256–60, 389 N.W.2d 12 (1986) (overruling prior case law that indicated certain procedural requirements in accepting pleas were mandated by the U.S. Constitution and clarifying the colloquy requirements are statutory only). Nathan does not argue that a colloquy is statutorily required here.

¶19 We are also unpersuaded by Nathan's analogies to *S.Y. v. Eau Claire County*, 162 Wis. 2d 320, 469 N.W.2d 836 (1991) and *State v. Thiel*, 2001 WI App 32, 241 Wis. 2d 465, 626 N.W.2d 26, where the courts required or relied on colloquies when individuals waived their right to

counsel in commitment proceedings. Nathan's circumstances are distinguishable. An individual appearing pro se by definition does not have an attorney to explain the rights being waived and potential consequences of the waiver or to make representations to the court regarding such a waiver. As such, practically speaking, the court has little choice but to conduct a colloquy in order to convey and obtain the necessary information. Here, in contrast, the circuit court was able to rely upon the representations made by counsel to determine if Nathan was appropriately informed about his rights and the consequences of a stipulation. Our holding in *S.Y.* does not support this court imposing a colloquy requirement in this circumstance.

¶20 Finally, it is important to keep in mind that due process requires that "a deprivation of life, liberty, or property" be preceded by process appropriate to the nature of the case. *Loudermill*, 470 U.S. at 542. Although the deprivation of liberty that comes from a civil commitment is significant,[3] the nature, purpose, and context of a civil commitment does not require process in the form of a colloquy. A ch. 51 involuntary commitment is pursued, in part, for the benefit of the individual. And the legislature has built robust procedures into ch. 51 that protect the subject individual prior to commitment. These protections impose demanding evidentiary standards that a petitioner must meet, by clear and convincing evidence, and tight mandatory deadlines within which a circuit court must comply to retain competency. *See* §§ 51.20(13)(e), 51.20(2), (7)–(10). Moreover, any commitment must be pursued in the least restrictive manner and is limited in time to a six-month initial commitment with one-year extensions. *See* §§ 51.001(2), 51.20(13)(c), 51.20(13)(g). In addition, the commitments are subject to post-disposition modifications. *See* §§ 51.20(13)(g) and (16). Given these statutory protections in place, procedural due process principles do not require a circuit court to conduct a colloquy before accepting an individual's stipulation in this context.

## III. CONCLUSION

¶21 Constitutional due process does not require that a court conduct a colloquy before accepting an individual's stipulation to an order

---

[3] *See Vitek v. Jones*, 445 U.S. 480, 491-92 (1980) ("We have recognized that for the ordinary citizen, commitment to a mental hospital produces 'a massive curtailment of liberty,' . . . and in consequence 'requires due process protection.'") (internal citations omitted).

for commitment and involuntary medication in a ch. 51 commitment proceeding. Nathan did not otherwise challenge the validity of his waiver of any fundamental rights. We affirm.

*By the Court.*—The decision of the court of appeals is affirmed.

REBECCA GRASSL BRADLEY, J., concurring.

¶22 This court granted review of a single issue: whether the Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a Wisconsin circuit court to conduct a formal colloquy with the subject of an involuntary commitment proceeding under WIS. STAT. § 51.20, before accepting the subject's "stipulation for commitment." The court concludes the Fourteenth Amendment does not require a colloquy. I agree. I do not join the majority opinion because the majority otherwise errs in pronouncing the law. While the majority properly construes the Due Process Clause, the majority calls into question the fundamental right to be free from physical restraint.

¶23 Although Nathan also challenged the lawfulness of "voluntarily" stipulating to an involuntary commitment, the court declined to consider that issue in granting Nathan's petition for review. Nothing in the majority opinion should be read to authorize a stipulation to an involuntary commitment. Logically, a person cannot voluntarily consent to be involuntarily committed. Because ch. 51 omits such stipulations, the judiciary has no authority to accept them.

I

¶24 In addressing Nathan's argument that the Due Process Clause requires the circuit court to conduct a colloquy before stipulating to a civil commitment, the majority characterizes the right to be free from physical restraint as a "*purported* fundamental right[]." Majority op., ¶13 (emphasis added). In answering the question in the negative, the majority "assume[s] without deciding" the right is fundamental. Majority op., ¶14. The majority thereby depreciates a right long recognized to be fundamental, and in the process imperils our liberty.

¶25 Both the United States Constitution and the Wisconsin Constitution protect liberty. The earliest charters of rights secure the right to liberty and restrain governments from infringing it except by due process of law. *See* MAGNA CARTA, ch. 39 (1215), reprinted in RALPH V. TURNER, MAGNA CARTA THROUGH THE AGES 231 (2003) ("No free man shall be arrested or imprisoned, or disseised [dispossessed of property], or outlawed or exiled or in any way victimized . . . except by the lawful judgment of his peers or by the law of the land."). "[T]he proper role of government—the very reason governments are instituted—is to secure

our inherent rights, including liberty . . . . An <u>inherent</u> right to liberty means all people are born with it; the government does not bestow it upon us and it may not infringe it." *Porter v. State*, 2018 WI 79, ¶52, 382 Wis. 2d 697, 913 N.W.2d 842 (Rebecca Grassl Bradley & Kelly, JJ., dissenting) (emphasis original). "'Give me liberty or give me death,' Patrick Henry's impassioned plea . . . embodies the fundamental importance of liberty . . . ." *Id.*

¶26    Instead of reaffirming the fundamental right to liberty, the majority "assume[s] without deciding that [the right to be free from physical restraint is] fundamental." Majority op., ¶14. The majority displaces certainty with vacillation. This court has long recognized that "[f]reedom from physical restraint is a fundamental right . . . ." threatened by civil commitment. *State v. Post*, 197 Wis. 2d 279, 302, 541 N.W.2d 115 (1995) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). We have repeatedly affirmed that "well established tenet" of civil commitment since first articulating it in *State v. Post*. *See, e.g., State v. Schulpius*, 2006 WI 1, ¶32, 287 Wis. 2d 44, 707 N.W.2d 495; *State v. Rachel*, 2002 WI 81, ¶61, 254 Wis. 2d 215, 647 N.W.2d 762 ("Freedom from physical restraint is a fundamental right protected by the due process clause from wrongful, arbitrary governmental action.") (citing *Foucha*, 504 U.S. at 80); *State v. Beyer*, 2006 WI 2, ¶21, 287 Wis. 2d 1, 707 N.W.2d 509 (same); *Winnebago Cnty. v. Christopher S.*, 2016 WI 1, ¶37, 366 Wis. 2d 1, 878 N.W.2d 109 (same). The majority does not explain why it "assume[s] without deciding" that freedom from physical restraint constitutes a fundamental right in the face of established precedent. The right to be free from physical restraint "has always been at the core of the liberty protected by the Due Process Clause . . . ." *Post*, 197 Wis. 2d at 302 (citations omitted).

¶27    Perhaps the nature of civil commitment proceedings, which are designed to ensure treatment of people with mental illnesses, causes the majority to doubt the fundamental nature of the People's right to be free from government-imposed restraint. Good intentions, however, do not alter the fundamental nature of a right all People possess. By carelessly calling into question the nature of a fundamental right, the majority imperils the liberty of not only those with mental illnesses, but the liberty of all.

II

¶28    The majority does not address the lawfulness of voluntarily stipulating to an involuntary commitment, a question Nathan raised but

the court declined to answer in granting Nathan's petition for review. Nathan stipulated to (1) Sheboygan County's evidence that supported the county's WIS. STAT. § 51.20 petition for commitment[1] and (2) Sheboygan County's petition for commitment itself, that is, the ultimate legal conclusions and disposition of his case. The majority merely assumes without deciding that a ch. 51 subject may voluntarily stipulate to an involuntary commitment, and the majority opinion should not be read to authorize such an incongruity.

A

¶29    Chapter 51 provides exhaustive procedures for accepting treatment voluntarily in lieu of commitment. Other avenues for voluntary treatment, such as "stipulating" to an involuntary commitment are nowhere to be found. Chapter 51 does not contemplate sidestepping the procedural protections of a ch. 51 hearing by entering a "no contest stipulation" to a "County's request" for commitment, as Nathan's attorney did in this case.

¶30    If the Wisconsin Legislature wanted to provide for a "no contest stipulation" in a ch. 51 hearing, it knew how. For example, chs. 102 and 778 both expressly provide for "no contest stipulations" in civil forfeiture proceedings. WIS. STAT. § 102.87(4) ("A defendant may make a stipulation of no contest . . . ."); WIS. STAT. § 778.26(4) (same); *see also* WIS. STAT. § 66.0114(1)(b). In practice, Wisconsin circuit courts have read "no contest stipulations" into ch. 51 despite the legislature having omitted them.

¶31    Courts in other jurisdictions have accepted "stipulations to commitment," but only pursuant to statutes. For example, Montana's statutory code expressly contemplates "stipulations to commitment." *See*

---

[1] In a non-emergency situation, a county (or anyone else) may file a formal petition for commitment under WIS. STAT. § 51.20(1) *et seq.* In an emergency, law enforcement may detain an individual under § 51.15(5). The detaining officer then files a "statement of emergency detention . . . with the court . . . ." *Id.* In that case, the "statement of emergency detention" becomes the county's petition for commitment. *Id.* ("The filing of the statement has the same effect as a petition for commitment under s. 51.20.") In this case, Sheboygan County's petition arose from Nathan's emergency detention.

MONT. CODE ANN. § 53-21-119(3) (2025) ("The respondent's rights may otherwise be waived: (a) by the respondent, if the court finds the respondent is capable of making an intentional or knowing decision; or (b) by the respondent's counsel and the friend of the respondent, if any, acting together, if a record is based on the reasons for the waiver."). Unlike Montana's Code, the Wisconsin Statutes do not contemplate a general waiver of ch. 51 hearing rights. Wisconsin permits only *specific* waivers such as a subject's right to a jury trial, WIS. STAT. § 51.20(11)(a), the right to a speedy trial, § 51.20(8)(bg), and the right to make (particular) evidentiary stipulations, § 51.20(10)(c) (incorporating WIS. STAT. § 807.05). Given the specificity with which the Wisconsin Legislature provided for waivers of particular rights, we should presume the legislature's omission of a general waiver was intentional.

¶32     The subject of a WIS. STAT. § 51.20 petition for involuntary civil commitment who wishes to pursue treatment voluntarily, has only two paths to do so—neither of which involve "stipulating to commitment." First, under § 51.10, "[a] person against whom a petition for involuntary commitment has been filed under s. 51.15 or 51.20 may agree to be admitted to an inpatient treatment facility." WIS. STAT. § 51.10(6).[2]

---

[2] WISCONSIN STAT. § 51.10(6) provides:

**51.10 Voluntary admission of adults.**

. . .

**(6)** A person against whom a petition for involuntary commitment has been filed under s. 51.15 or 51.20 may agree to be admitted to an inpatient treatment facility under this section. The court may permit the person to become a voluntary patient or resident pursuant to this section upon signing an application for voluntary admission, if the director of the appropriate county department under s. 51.42 or 51.437 and the director of the facility to which the person will be admitted approve of the voluntary admission within 30 days of the admission. Except as provided in s. 51.20 (8) (bg) or (bm), the court shall dismiss the proceedings under s. 51.20 30 days after the person's admission if the person is still a voluntary patient or resident or upon the discharge of the person by the treatment director of the facility or his or her designee, if that occurs first. For any person who is a voluntary patient or resident under this subsection, actions required under s. 51.35 (5) shall be initiated within 14 days of admission.

That section requires the subject's consent through a signed application to the court, the facility's consent, and the court's consent. *Id.* Section 51.10(6) obviates a § 51.20 final hearing, which allows a subject to avoid findings of "dangerousness" or "mental illness," as well as § 51.20's dispositions for involuntary commitment. A § 51.10 admission is entirely voluntary. If the person continues a voluntary inpatient admission after thirty days, or if the facility discharges the patient before thirty days, the court "shall dismiss the proceedings under s. 51.20 . . . ." *Id.*

¶33 Alternatively, the subject of a WIS. STAT. § 51.20 petition can postpone a final hearing for up to ninety days under a "settlement agreement" with the county. WIS. STAT. § 51.20(8)(bg).[3] Unlike the voluntary *inpatient* treatment provided under § 51.10, this provision allows a person to avert a commitment hearing with an *outpatient* treatment plan and county monitoring. Like the procedure provided

---

[3] WISCONSIN STAT. § 51.20(8)(bg) provides:

**(8)** DISPOSITION PENDING HEARING.

. . .

> **(bg)** The subject individual, or the individual's legal counsel with the individual's consent, may waive the time periods under s. 51.10 or this section for the probable cause hearing or the final hearing, or both, for a period not to exceed 90 days from the date of the waiver, if the individual and the counsel designated under sub. (4) agree at any time after the commencement of the proceedings that the individual shall obtain treatment under a settlement agreement. The settlement agreement shall be in writing, shall be approved by the court and shall include a treatment plan that provides for treatment in the least restrictive manner consistent with the needs of the subject individual. Either party may request the court to modify the treatment plan at any time during the 90-day period. The court shall designate the appropriate county department under s. 51.42 or 51.437 to monitor the individual's treatment under, and compliance with, the settlement agreement. If the individual fails to comply with the treatment according to the agreement, the designated county department shall notify the counsel designated under sub. (4) and the subject's counsel of the individual's noncompliance.

under § 51.10, this treatment path requires the consent of the ch. 51 subject, the county, and the circuit court.

¶34 WISCONSIN STAT. §§ 51.10(6) and 51.20(8)(bg) are the only avenues available to someone facing involuntary commitment who wishes to pursue treatment voluntarily. Chapter 51 does not contemplate a "stipulation to commitment" at a final hearing because a person cannot voluntarily consent to be involuntarily committed. The judiciary may not create an additional avenue the legislature omitted from the law.

¶35 Chapter 51's exhaustive procedures for voluntary treatment, and deafening silence on "stipulations to commitment," are dispositive. We read statutes as a whole. *State ex rel. Kalal v. Cir. Ct. for Dane Cnty.*, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole . . . ."). When "the thing specified can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved," the negative-implication canon applies. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) (emphasis original). Reading ch. 51 as a whole, it is clear there are only two avenues for consenting to inpatient or outpatient treatment. Judicial inventions like a "stipulation to commitment" encroach on the prerogative of the People's representatives to make the law.

¶36 In an analogous context, we recently recognized a criminal defendant may not "stipulate to every fact that satisfies a defendant's guilt <u>and</u> the defendant's guilt as well" because "Wisconsin's rules of criminal procedure do not expressly permit" such a procedure. *State v. Beyer*, 2021 WI 59, ¶¶20-21, 397 Wis. 2d 616, 960 N.W.2d 408 (emphasis original). We likened such "stipulated trials" to conditional guilty pleas, neither of which are among the four types of pleas provided by statute: "(1) guilty; (2) not guilty; (3) no contest with permission from the circuit court; and (4) not guilty due to mental disease or defect. WIS. STAT. § 971.06(1)(a)-(d)." *Id.*, ¶¶18, 24. Although criminal in nature, *Beyer*'s reasoning applies in the context of civil commitments under ch. 51. Wisconsin courts must confine hearing procedures to those provided by law. Just as criminal procedures under ch. 971 do not contemplate "stipulated trials," civil commitment procedures under ch. 51 do not provide for "stipulated commitments." If the legislature omits a procedure, the judiciary may not invent one. *See Beyer*, 397 Wis. 2d 616, ¶22.

¶37     Under ch. 51, the legislature enacted only two avenues for the subject of a ch. 51 involuntary commitment proceeding to seek voluntary treatment: voluntary admission under WIS. STAT. § 51.10(6), or a 90-day "settlement agreement" under § 51.20(8)(bg). While a party may stipulate to the truth of a fact in a ch. 51 hearing, a stipulation to the *disposition* of an involuntary commitment proceeding appears nowhere in ch. 51. The judiciary has no authority to engraft such a procedure onto enacted law.

¶38     If the subject of a civil commitment petition wishes to stipulate to an involuntary commitment, it is reasonable to question why the courts would not allow it. Even if the law left leeway for the courts to conduct ch. 51 hearings as they see fit, "there are limits to waiver; if the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept." *United States v. Josefik*, 753 F.2d 585, 588 (7th Cir. 1985). Facing infringement of their liberty, subjects of involuntary commitment proceedings are entitled to not only a minimum of "civilized procedure," but that which the law expressly gives them. The legislature makes the law, and courts are bound to follow it. The procedures followed for Nathan's commitment hearing fell outside the law. While the court declined to address this statutory question, nothing in the majority opinion should be read to condone the process by which Nathan was committed.

B

¶39     The transcript of Nathan's commitment hearing showcases the incongruity of voluntarily stipulating to an involuntary commitment. Nathan seemed willing to agree to some form of treatment—but only on his terms.  Nathan repeatedly expressed his resistance to what the county sought, which the circuit court ultimately ordered, notwithstanding Nathan's misgivings.

¶40     At the beginning of Nathan's hearing, the circuit court asked Sheboygan County to call its first witness. Sheboygan County's attorney responded:

> Your Honor, speaking with [Nathan's attorney], it's my understanding that [Nathan] is not contesting the request by the County at this point. So I'd be asking the Court to move

both doctors' report into the record and use those as a basis for the Court's findings along with [Nathan's] stipulation.

At the court's request, Nathan's attorney responded:

Your Honor, having reviewed both doctors' evaluations and going through them with my client, we are not disagreeing, AKA, contesting the doctors' recommendation and therefore the County's request. So we are stipulating to the request of the County.

My client would like to be released today, but he understands based on that request that he would be released by the treating physician there at [the hospital] and that it is a locked facility at this time. He is not contesting at this point. He's working with the Department. And, again, based on those doctors' evaluation, he's not contesting.

¶41 The court memorialized its understanding that Nathan wished to stipulate to his commitment: "Okay. So, [Nathan], stipulation just means you're agreeing that the Court, meaning me, [the court], can grant a commitment in your case; is that correct?" Nathan responded, "I suppose." The court received the doctors' report into evidence, made findings of fact based on the doctors' report, and ultimately ordered Nathan's commitment. Finally, the court ordered involuntary medication and "asked" Nathan to take his medication voluntarily.

¶42 At multiple points during the hearing, Nathan asked to be released that day. At least seven times, Nathan or his attorney told the court Nathan wanted to be released immediately or within a timeframe he found agreeable:

Attorney Blum: My client would like to be released today.

. . .

[Nathan]: I will continue to agree [to take my medication voluntarily] if I get discharged from [the locked facility] here.

. . .

[Nathan]: How long do I have to wait?"

. . .

[Nathan]: Well, I thought that we were evaluating [my discharge] today on the court date.

. . .

Attorney Blum: I reiterated earlier [Nathan] does want to be released today.

. . .

Nathan: [I agree to be committed] [o]nly if I'm able to be discharged in the next, you know, agreeable period of time.

Nathan's repeated insistence on being discharged prompted the court to ask Nathan again whether he was stipulating to his commitment: "Okay. And are you also agreeing that there can be a commitment order?" After additional back and forth, the court said: "Well, it's unclear to me whether this is an actual *stipulation to commitment* or not" (emphasis added). The circuit court, as well as counsel for the parties, seemed to understand the statutes to contemplate a contradiction in terms: a *voluntary* stipulation to an *involuntary* commitment.

¶43 The Wisconsin Statutes give circuit courts the authority to "order commitment to the care and custody of the appropriate county department . . . ." WIS. STAT. § 51.20(13)(a)3. "Custody" means legal custody, not physical. In this case, the circuit court made the following finding: "The dangerousness of the subject is likely to be controlled with appropriate medication administered on an outpatient basis." However, the court order designated the "maximum level of treatment" to be "a locked inpatient facility."

¶44 The circuit court repeatedly explained to Nathan that the court was leaving Nathan's release up to his doctors, who would decide his release *after* Nathan stipulated to his commitment. When Nathan protested that he wanted to be released that day at his hearing, the court reminded Nathan the decision would be made by his doctors:

[Nathan]: I will continue to agree [to take my medication] if I get discharged from [the hospital] here.

The Court: Yeah. That will lead to your discharge eventually because that will help stabilize you.

[Nathan]: How long do I have to wait?

The Court: That's something you'd have to ask your doctor because that will be when your doctor thinks you're ready.

¶45 Only after Dr. Bales estimated that Nathan would be released from the hospital "within a day or two" did Nathan seem to consent: "All right. So, [Nathan], with that representation by Dr. Bales, who is on the phone as well, are you willing to agree to the commitment?" Nathan responded, "Yes. I'm willing to agree." While Nathan agreed to voluntary treatment conditioned on a discharge from inpatient treatment, no one explained on the record that the circuit court involuntarily committed Nathan to Sheboygan County's legal custody for six months under WIS. STAT. § 51.20(13)(g)1.,[4] unless and until the circuit court canceled its commitment order under § 51.20(16)(a).[5] Telling Nathan he

---

[4] WISCONSIN STAT. § 51.20(13)(g)1. provides:

**(13)** DISPOSITION.

    **(g)**

        **1.** The first order of commitment of a subject individual under this section may be for a period not to exceed 6 months, and all subsequent consecutive orders of commitment of the individual may be for a period not to exceed one year.

[5] WISCONSIN STAT. § 51.20(16)(a) provides:

**(16)** REEXAMINATION OF PATIENTS.

    **(a)** Except in the case of commitments under s. 51.45 (13), any patient who is involuntarily committed for treatment under this chapter may on the patient's own verified petition. . . or on the verified petition of the patient's guardian, relative, friend, or any person

would probably get out of the locked hospital "within a day or two" suggested to Nathan that his doctors had the power to terminate the court's § 51.20 commitment order in a couple of days—if he just waived his rights, waited patiently at the hospital, and took his medications. While the circuit court *could have* canceled its commitment order after a couple of days, Nathan also faced a potential six-month hospital stay and involuntary medication. Explaining those possibilities would have been far less likely to procure Nathan's "voluntary" consent to an involuntary commitment.

¶46     By definition, a civil commitment is involuntary. Accepting a "stipulation to commitment" procured with assurances of a release from physical restraint in mere days obfuscates the curtailment of liberty accompanying civil commitment. Even if the law permitted stipulations to an involuntary commitment, civil committees cannot voluntarily agree to commitment if they do not know the rights they relinquish in the process. On this record, Nathan stipulated to his commitment without appreciating the consequences of doing so.

¶47     Upon Nathan expressing some willingness to accept treatment, the proper legal course would have been to follow one of the two statutorily prescribed procedures rather than pursuing the concededly convenient but improper process the parties and the circuit court adopted.  The only other alternative would have been to afford Nathan the adversarial hearing to which he was entitled under the law. Given the significant deprivation of liberty accompanying civil commitments, extra-legal procedures cannot be condoned.

¶48     For the foregoing reasons, I respectfully concur in the majority's judgment.

---

providing treatment under the order of commitment request a reexamination or request the court to modify or cancel an order of commitment.

REBECCA FRANK DALLET, J., with whom JANET C. PROTASIEWICZ and SUSAN M. CRAWFORD, JJ., join, concurring.

¶49  The circuit court put it best when it said it was "unclear . . . whether this is an actual stipulation to commitment or not." The hearing transcript demonstrates that Nathan did not fully understand what he was agreeing to when he "stipulated" to involuntary commitment and medication under WIS. STAT. §§ 51.20 and 51.61(1)(g)3. I share Nathan's confusion. Nathan's attorney represented that he was "stipulating to the request of the County," but what exactly was that request?[1]

¶50  One possibility is that the County was simply requesting that the circuit court admit the doctors' reports into evidence. Assuming that everyone—Nathan included—understood that, I see no problem with it. Parties and their lawyers stipulate to the admission of evidence all the time.

¶51  But that is not how the parties and majority opinion characterize the stipulation. They understand it as Nathan's agreement to court-ordered involuntarily commitment and medication under § 51.20. But there are contradictions inherent in such a stipulation. The point of court-ordered involuntary commitment and involuntary medication is to overcome an individual's constitutionally protected "right to refuse unwanted medical treatment." *Outagamie County v. Melanie L.*, 2013 WI 67, ¶42, 349 Wis. 2d 148, 833 N.W.2d 607. You don't need to involuntarily treat someone who is agreeing to be treated.

¶52  Moreover, one of the statutory requirements for ordering involuntary medication is that the subject individual is not capable of understanding the benefits and drawbacks of medication, or applying such an understanding to their own situation. *See* § 51.20(1)(a)2.e. But how can someone incapable of understanding the benefits or drawbacks of medication agree that they lack that capacity? Perhaps for these reasons, chapter 51 contains no provisions authorizing or even contemplating a stipulation to involuntary medication or commitment. Instead, it authorizes court-approved settlement agreements providing for *voluntary* administration of treatment and medication, backed by the possibility of

---

[1] A written stipulation (if one ever existed) is not in the record.

detention if the subject individual does not comply with the agreement. *See* § 51.20(8)(bg)–(br).

¶53    Nathan did not raise these issues, but they may come up in a future case. In the meantime, no one should take what happened here as a guide for how to conduct chapter 51 proceedings. The exact parameters of any stipulation should be clear to everyone. If confusion arises, efforts should be made to alleviate it, instead of rushing to conclude the hearing. Those efforts should include providing the parties an opportunity to speak with counsel, especially when, as here, they ask to do so. For remote proceedings,[2] this may require some advanced planning to ensure the availability of a breakout room or another private channel of communication. *See State v. Grady*, 2025 WI 22, ¶29, 416 Wis. 2d 283, 21 N.W.3d 353 (Dallet, J., concurring).[3] If more time is needed, adjournment is also an option.

¶54    At the end of the day, the circuit court need not accept any stipulation. In this case, a doctor was standing by to provide testimony in support of the involuntary commitment and medication petitions. Receiving that testimony as part of a contested final hearing would have taken far less time than it has taken for this case to move through the appellate process.

¶55    All this being said, the issue in this case is a narrow one: whether the Fourteenth Amendment's Due Process Clause requires a circuit court to conduct a colloquy before accepting a stipulation to

---

[2] Respondents in chapter 51 proceedings are "entitled to be physically present in the courtroom at all . . . dispositional hearings." WIS. STAT. § 885.60(2)(a). While Nathan did not object to appearing remotely in this case, if he had, the court would have been required to sustain the objection. *See* § 885.60(2)(d).

[3] *See also* WIS. STAT. § 885.54(1)(g) (requiring "a separate private voice communication facility" when a chapter 51 subject individual and their attorney appear remotely by videoconferencing technology from different physical locations); Comment, 2008, § 885.60 ("This section also protects such litigants' rights to adequate representation by counsel by eliminating the potential problems that might arise where counsel and litigants are . . . physically separated . . . .").

involuntary commitment and medication under § 51.20. *See* majority op., ¶9. On that narrow issue, I agree with the majority that a colloquy is not required, and join the majority opinion. Accordingly, I respectfully concur.

J<span>ANET</span> C. P<span>ROTASIEWICZ</span>, J., with whom R<span>EBECCA</span> F<span>RANK</span> D<span>ALLET</span> and S<span>USAN</span> M. C<span>RAWFORD</span>, JJ., join, concurring.

¶56     The majority concludes that the Fourteenth Amendment's Due Process Clause does not require a circuit court to conduct a colloquy before accepting an individual's stipulation to an involuntary commitment under W<span>IS</span>. S<span>TAT</span>. § 51.20 and ordering involuntary medication or treatment under W<span>IS</span>. S<span>TAT</span>. § 51.61(1)(g). The majority does not decide whether Nathan's stipulation was knowing, intelligent, and voluntary because Nathan did not brief that issue. I concur. I write separately to emphasize the limited reach of the court's decision and to identify questions that it leaves unresolved.

¶57     Citing *Boykin v. Alabama*, 395 U.S. 238 (1969), Nathan argues that before accepting a guilty plea, due process requires a trial court to engage in a personal colloquy with a criminal defendant to ensure that he has made a knowing, intelligent, and voluntary waiver of his rights. He contends that the same requirement should apply to a stipulation to an involuntary commitment. But *Boykin* does not mandate a personal colloquy. It holds only that a trial court may not accept a defendant's guilty plea "without an *affirmative showing* that it was intelligent and voluntary." *Id*. at 242 (emphasis added). As the majority notes, Wisconsin's personal colloquy requirement for a guilty plea arises from statute, not from due process. *See State v. Bangert*, 131 Wis. 2d 246, 260–61, 389 N.W.2d 12 (1986) (citing W<span>IS</span>. S<span>TAT</span>. § 971.08(1)); majority op., ¶18.

¶58     The consequences of a stipulated commitment can be grave. A commitment is a "massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509 (1972). It may "engender adverse social consequences" that can have a significant impact on the individual. *Addington v. Texas*, 441 U.S. 418, 426 (1979). It may also lead to "[c]ompelled treatment in the form of mandatory behavior modification." *Vitek v. Jones*, 445 U.S. 480, 492 (1980). It is therefore settled that a "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington*, 441 U.S. at 425.[1] Accordingly, due process requires

---

[1] While not at issue in this case, a stipulation to a commitment or recommitment could also trigger collateral consequences for the individual, including the loss of the right to possess a firearm and liability for the costs of the commitment. *See Sauk County v. S.A.M.*, 2022 WI 46, ¶¶21, 27, 402 Wis. 2d 379, 975 N.W.2d 162.

an affirmative showing on the record that a stipulation to a commitment is intelligent and voluntary. That affirmative showing may be satisfied by procedures other than a personal colloquy.

¶59 What remains unresolved is this: what form of affirmative showing does due process require before a circuit court may approve a stipulation to an involuntary commitment as intelligent and voluntary? Wisconsin has yet to answer that question in a published opinion.

¶60 The majority opinion also should not be read to hold that the law permits a stipulation to an involuntary medication or treatment order. Nathan did not preserve that issue in the lower courts, and we did not grant review of it.

¶61 The evidentiary burdens for an involuntary commitment and involuntary medication or treatment are distinct. A court may commit an individual based on clear and convincing evidence that he is mentally ill, dangerous, and a proper subject for treatment. *See* WIS. STAT. § 51.20(1)(a)1.–2.; § 51.20(13)(e). Yet the individual generally may refuse medication and treatment until a court finds him incompetent to make medication or treatment decisions under the standards in § 51.61(1)(g). *See* WIS. STAT. § 51.59(2). If an examiner files a report opining that the individual is incompetent to make medication or treatment decisions, query whether the individual is competent to stipulate to involuntary medication or treatment? A stipulation to medication or treatment is itself a decision about medication or treatment. The majority appropriately does not address this issue. It remains for a future case.

¶62 For these reasons, I respectfully concur.